## PEARCY *v.* STRANAHAN.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE
SOUTHERN DISTRICT OF NEW YORK.

No. 1.　Submitted March 4, 1907.—Decided April 8, 1907.

The averment that territory named in the complaint is a part of the United
States is a conclusion of law and not admitted by a demurrer.

The court takes judicial cognizance whether or not a given territory is
within the boundaries of the United States, and is bound to take the fact
as it really exists however it may be averred to be.

Who is the sovereign *de jure* or *de facto* of territory is not a judicial, but a
political, question, the determination of which by the legislative and execu-
tive departments of any government conclusively binds the judges as
well as all other officers, citizens and subjects of that government. *Jones*
v. *United States*, 137 U. S. 202.

The Isle of Pines under the provisions of the Platt Amendment and the
Constitution of the Republic of Cuba is *de facto* under the jurisdiction of
the Republic of Cuba, and, as the United States has never yet taken
possession thereof, it has remained and is foreign country within the
meaning of the Dingley Tariff Act of 1897. *DeLima* v. *Bidwell*, 182
U. S. 1; *United States* v. *Rice*, 4 Wheat. 246.

THE facts, which involve the political status of the Isle
of Pines and whether it is under the jurisdiction of Cuba or
that of the United States, and whether merchandise therefrom
is subject to duty, as coming from a foreign country within
the meaning of the Dingley Tariff Act, are stated in the opinion.

*Mr. James C. Lenney* for plaintiff in error:

Up to the ratification of the second Treaty of Paris (April 11,
1899), the Isle of Pines was under the sovereignty of the Crown
of Spain. It did not belong to, nor was it a part of, the Island
of Cuba.

Spain acquired title to and sovereignty over the Isle of Pines
by right of discovery.

Spain, until A. D. 1899, retained the title and sovereignty
thus acquired.

Since a territory can have but one sovereignty at one time, it follows that the Island of Cuba at no time prior to 1899 acquired any title to the Isle of Pines, either expressly or by implication.

No authority has been found to hold that the maritime jurisdiction of one island can extend to another island located in the open sea forty miles distant from the nearest shore. Geographically, then, there appears to be no ground for holding that the Isle of Pines belonged to or was a part of the Island of Cuba.

In the absence, therefore, of any express cession of sovereignty to Cuba, or of any impliable intention to include this isle as a part of Cuba, or of any good geographical reason for so doing, it must follow that on April 11, 1899, Spain did own, and Cuba, a mere colony, did not own or include, the Isle of Pines.

Under article II of the said treaty—"Spain cedes to the United States the Island of Porto Rico and other islands now under Spanish sovereignty in the West Indies. . . .—the Isle of Pines passed direct from the sovereignty of the Crown of Spain to that of the people of the United States.

The only reasonable construction is that by article II of the treaty, as above quoted, the United States acquired all the islands under Spanish sovereignty in the West Indies except the Island of Cuba.

The very language of the treaty itself, as explained in the protocols and construed according to its fair and ordinary meaning, is overwhelmingly in favor of this proposition.

On or about August 14, 1899, the United States War Department, in an official letter stated:

"The Isle of Pines, . . . was ceded by Spain to the United States, and is, therefore, a part of our territory."

The maps and other data prepared and issued by the General Land Office of the Department of the Interior indicate the Isle of Pines as being United States territory.

The "Platt Amendment" provided:

"That the Isle of Pines shall be *omitted* from the proposed constitutional boundaries of Cuba; the title thereto being left to future adjustment by treaty."

When Cuba was transferred to the government of its people, on May 20, 1902, the American military governor of Cuba was ordered by the United States Secretary of War *to continue* "*the present government of the Isle of Pines*" (which was American) "as the *de facto* government."

By the terms of the proposed treaty, negotiated in 1903 and still pending in the United States Senate, our country's present ownership of the Isle of Pines is clearly recognized by the sections which provide for a transfer of our title to Cuba, the consideration being certain naval stations which we theretofore possessed.

Under article II of the treaty, the Isle of Pines was ceded directly to the United States.

It is a historical fact that at this time Spanish sovereignty in the West Indies was limited to Cuba, Porto Rico, the Isle of Pines, and some very small, insignificant islands, mostly uninhabited and located round about these three large ones. Such being the fact, the only reasonable conclusion from this language can be, that by the "other islands" phrase it was the intention of the parties to cede, and they did cede, the Isle of Pines direct from the Crown of Spain to the people of the United States just as plainly as Porto Rico, in the same article, was ceded. It cannot be too greatly emphasized that such is the only reasonable construction applicable to this phrase. Unless it refers to the Isle of Pines, it means nothing, and certainly it would be a most serious imputation to hold that the learned commissioners deliberately inserted words meaning nothing or worse than nothing into so important a document of state.

Official acts and declarations subsequent to the treaty support the same view.

Not only did all the parties thus intend at the time of the making of the treaty, but subsequent acts and declarations

for more than three years thereafter were almost uniformly in support of this view. We already have official declarations, both executive and legislative.

The "Platt Amendment" expressly excludes the Isle of Pines from the boundaries of Cuba.

Plaintiff calls attention to article VI of the amendment to the Army Appropriation Bill, passed March 2, 1901, and widely known by the popular title "Platt Amendment." This amendment, which is still in force, expressly provided "that the Isle of Pines shall be omitted from the proposed constitutional boundaries of Cuba, the title thereto being left to future adjustment by treaty."

This clause is doubly significant, showing, as it does, the attitude of both the republics. Up to this point we have been noting the acts of our own Government and the attitude of our own people. That the Cubans themselves claimed no conflicting title is clearly proven by their vote on June 12, 1901. Without discussion and without debate, the Cuban Congress incorporated this identical language into their own constitution. By so doing they expressly admitted, first, that the Isle of Pines was not then a part of the Cuban Republic, and, secondly, that the isle should not become Cuban soil unless granted to the Republic from the United States by good and valid treaty. The effect of this action must have been to leave the isle as theretofore, under American administration and control; for when the congresses of both countries have expressly declared that at present the Isle of Pines is not Cuban territory it must be territory of the United States.

The Isle of Pines, not being a foreign country under the tariff law, but, like Porto Rico, a part of the United States, it follows that the seizure, etc., complained of by plaintiff and the detention after demand made was unwarranted, illegal, and an act of conversion. *De Lima* v. *Bidwell*, 182 U. S. 1, 198 *et seq.; Dooley* v. *United States*, 182 U. S. 222; *Armstrong* v. *United States*, 182 U. S. 243.

*The Attorney General, The Solicitor General* and *Mr. Otis J. Carlton,* Special Assistant to the Attorney General, for defendant in error, submitted:

Whether the Isle of Pines be included within the boundaries of the United States is a political question, which cannot be decided by this court, being nonjudicial in its nature.

The question in this case resolves itself into a question of boundaries within the principle of the following cases: *Foster* v. *Neilson,* 2 Pet. 253; *Garcia* v. *Lee,* 12 Pet. 511; *United States* v. *Arredondo,* 6 Pet. 691.

It is well settled that the courts of the United States are scrupulous to exercise no power not clearly judicial in its nature. *Hayburn's case,* 2 Dallas, 409; *United States* v. *Ferreira,* 13 How. 40; *United States* v. *Yale Todd,* 13 How. 52 (note); *Gordon* v. *United States,* 117 U. S. 697.

If it be considered that the title to the Isle of Pines has been determined by the political departments to be in the United States, the fact that the question of ownership by mutual agreement between the United States and the Republic of Cuba is to be settled by arbitration, the adjudication to take the form of a treaty, excludes this court from its jurisdiction to decide the question of title in this case.

While this court, as a general rule, will decide questions of individual rights, founded upon a treaty, by ascertaining and following the determination of the political departments upon political questions, still, if those departments, charged with the settlement of our relations with foreign powers, have directed that political questions be settled in a certain manner, that determination is conclusive on the courts.

It is well settled that, even to determine questions judicial in their nature, special tribunals may be erected, their decisions to be final and conclusive on the courts. *United States* v. *Ferreira,* 13 How. 40; *Murray* v. *Hoboken &c. Co.,* 18 How. 280; *Bates & Guild Co.* v. *Payne,* 194 U. S. 109; *United States* v. *Ju Toy,* 198 U. S. 253.

The Isle of Pines was not ceded to the United States by the

treaty of peace, article II, but was included within the term
"Cuba" in article I.

.The Isle of Pines is, by a well-settled principle of interna-
tional law, a part of Cuba. Hall's International Law, edition
of 1895, pp. 129, 130.

We intervened in aid of the Cuban revolutionists from the
highest motives of. humanity, and not to wage a war of con-
quest.

The term "Cuba," historically and politically, includes the
Isle of Pines.

· This is shown by the official acts of the Spanish Govern-
ment, which, from 1774 to 1898, treated the Isle of Pines, as
included in the political division known as Cuba, just as the
Island of Nantucket is included in the Commonwealth of
Massachusetts.

Conceding, for the purposes of argument only, that the Isle
of Pines was ceded to the United States by the treaty of peace,
as we have never taken possession of the island, and as it has
been and is being governed by the Republic of Cuba, it has
not ceased to be "foreign country" within the Dingley Act.

. MR. CHIEF JUSTICE FULLER delivered the opinion of the court.

· Plaintiff brought his action in the Circuit Court of the
United States for the Southern District of New York against
the then collector of the port of New York to recover the value
of certain cigars seized by him, which had been brought to that
port from the Isle of Pines, where they had been produced and
manufactured. This seizure was made under the Dingley
Act, so called (act July 24, 1897, 30 Stat. 151, c. 11), and the
regulations of the Secretary of the Treasury thereunder. The
Dingley Act provided for the imposition of duties "on articles
imported from foreign countries," and in plaintiff's complaint
it was asserted that the Isle of Pines was "in possession of and
part of the United States," and hence domestic territory.
The Government demurred, the demurrer was sustained, the

complaint dismissed and the case brought here on a writ of error.

Whether the Isle of Pines was a part of the United States is a conclusion of law not admitted by the demurrer. It was certainly not such before the treaty of peace with Spain, and, if it became so, it was by virtue of that treaty. The court takes judicial cognizance whether or not a given territory is within the boundaries of the United States, and is bound to take the fact as it really exists, however it may be averred to be. *Jones* v. *United States*, 137 U. S. 202; *Lincoln* v. *United States*, 197 U. S. 419; *Taylor* v. *Barclay*, 2 Sim. 213.

August 12, 1898, a protocol of agreement for a basis for the establishment of peace was entered into between the United States and Spain, which provided:

"ARTICLE I. Spain will relinquish all claim of sovereignty over and title to Cuba.

"ARTICLE II. Spain will cede to the United States the island of Porto Rico and other islands now under Spanish sovereignty in the West Indies, and also an island in the Ladrones to be selected by the United States." 30 Stat. 1742.

This was followed by the treaty of peace, ratified April 11, 1899, containing the following articles:

"ARTICLE I. Spain relinquishes all claim of sovereignty over and title to Cuba.

"And as the island is, upon its evacuation by Spain, to be occupied by the United States, the United States will, so long as such occupation shall last, assume and discharge the obligations that may under international law result from the fact of its occupation, for the protection of life and property."

"ARTICLE II. Spain cedes to the United States the island of Porto Rico and other islands now under Spanish sovereignty in the West Indies, and the island of Guam in the Marianas or Ladrones." 30 Stat. 1754–1755.

In *Neely* v. *Henkel*, 180 U. S. 109 (Jan. 14, 1901), the question was whether Cuba was a foreign country or foreign territory within the act of Congress of June 6, 1900 (31 Stat. 656, c. 793),

providing for the extradition from the United States of persons committing crimes within any foreign country or foreign territory or any part thereof, occupied or under the control of the United States. And it was held that Cuba was within this description. Mr. Justice Harlan, delivering the opinion of the court, said:

"The facts above detailed make it clear that within the meaning of the act of June 6, 1900, Cuba is foreign territory. It cannot be regarded, in any constitutional, legal or international sense, a part of the territory of the United States.

"While by the act of April 25, 1898, declaring war between this country and Spain, the President was directed and empowered to use our entire land and naval forces, as well as the militia of the several States to such extent as was necessary, to carry such act into effect, that authorization was not for the purpose of making Cuba an integral part of the United States but only for the purpose of compelling the relinquishment by Spain of its authority and government in that island and the withdrawal of its forces from Cuba and Cuban waters. The legislative and executive branches of the Government, by the joint resolution of April 20, 1898, expressly disclaimed any purpose to exercise sovereignty, jurisdiction or control over Cuba 'except for the pacification thereof,' and asserted the determination of the United States, that object being accomplished, to leave the government and control of Cuba to its own people. All that has been done in relation to Cuba has had that end in view and, so far as the court is informed by the public history of the relations of this country with that island, nothing has been done inconsistent with the declared object of the war with Spain.

"Cuba is none the less foreign territory, within the meaning of the act of Congress, because it is under a military governor appointed by and representing the President in the work of assisting the inhabitants of that island to establish a government of their own, under which, as a free and independent people, they may control their own affairs without inter-

ference by other nations. The occupancy of the island by troops of the United States was the necessary result of the war. That result could not have been avoided by the United States consistently with the principles of international law or with its obligations to the people of Cuba.

"It is true that as between Spain and the United States—indeed, as between the United States and all foreign nations—Cuba, upon the cessation of hostilities with Spain and after the treaty of Paris was to be treated as if it were conquered territory. But as between the United States and Cuba that island is territory held in trust for the inhabitants of Cuba to whom it rightfully belongs and to whose exclusive control it will be surrendered when a stable government shall have been established by their voluntary action."

If then the Isle of Pines was not embraced in article II of the treaty, but was included within the term "Cuba" in article I, and therefore sovereignty and title were merely relinquished, it was "foreign country" within the Dingley Act.

This inquiry involves the interpretation which the political departments have put upon the treaty. For, in the language of Mr. Justice Gray, in *Jones* v. *United States*, 137 U. S. 202, "who is the sovereign, *de jure* or *de facto*, of a territory is not a judicial but a political question, the determination of which by the legislative and executive departments of any Government conclusively binds the judges as well as all other officers, citizens, and subjects of that Government."

By the joint resolution of April 20, 1898, 30 Stat. 738, entitled "Joint resolution for the recognition of the independence of the people of Cuba, demanding that the Government of Spain relinquish its authority and Government in the Island of Cuba, and to withdraw its land and naval forces from Cuba and Cuban waters, and directing the President of the United States to use the land and naval forces of the United States to carry these resolutions into effect," the United States disclaimed any disposition or intention to exercise sovereignty or control over Cuba, except in the pacification thereof, and

asserted its determination, when that was accomplished, to leave the control of the island to its people. What was the signification of the word "Cuba" at that time?

The record of the official acts of the Spanish Government from 1774 to 1898 demonstrates that the Isle of Pines was included in the political division known as "Cuba." The first official census of Cuba, in 1774; the "Statistical Plan of the Ever Faithful Isle of Cuba for the Year 1827;" the establishment by the Governor General, in 1828, of a colony on the island; the census of 1841; the budgets of receipts and expenses; the census for 1861, 1877, 1887, and so on, all show that the Isle of Pines was, governmentally speaking, included in the specific designation "Cuba" at the time the treaty was made and ratified, and the documents establish that it formed a municipal district of the province of Habana.

In short, all the world knew that it was an integral part of Cuba, and in view of the language of the joint resolution of April 20, 1898, it seems clear that the Isle of Pines was not supposed to be one of the "other islands" ceded by article II. Those were islands not constituting an integral part of Cuba, such as Vieques, Culebra and Mona Islands adjacent to Porto Rico.

Has the treaty been otherwise interpreted by the political departments of this Government? The documents to which we have had access, with the assistance of the presentation of the facts condensed therefrom in the brief for the United States, enable us to sufficiently indicate the situation in that regard, and we think it proper to do this, notwithstanding the determination of the case turns at last on a short point requiring no elaboration.

The Spanish evacuated Havana January 1, 1899, and the government of Cuba was transferred to a military governor as the representative of the President of the United States. The President ordered, August 17, 1899, a census to be taken as a first step toward assisting "the people of Cuba" to establish "an effective system of self-government." In accomplish-

ing this the island was divided into 1,607 enumeration districts. Three enumerators took the census of the Isle of Pines, which was described as a municipal district of the judicial district of Bejucal, in the Province of Habana. The report on the census, as published by the War Department in 1900, stated: "The government of Cuba has jurisdiction not only over the island of that name, but also over the Isle of Pines, lying directly to the south of it, and more than a thousand islets and reefs scattered along its northern and southern coasts. . . . The Isle of Pines, with an area of 840 square miles, is a municipal district of the Province of Habana. . . . The total population of Cuba, including the Isle of Pines and the neighboring keys, was, on October 16, 1899, 1,572,797."

The population tables give the population of the Isle of Pines as a municipal district of Habana Province, and so of the statistics as to rural population; sex, nativity and color; age and sex; birthplace; conjugal condition; school attendance; foreign whites; number and size of families; dwellings of families—these and like items are given as to the Isle of Pines as under the Province of Habana.

In August, 1899, the Military Governor of Cuba appointed a mayor and first assistant mayor of the Isle of Pines.

On June 16, 1900, an election was held throughout the island, at which the people of Cuba in all their municipalities elected their municipal officers, participated in by the inhabitants of the Isle of Pines, as is stated in the report of the Committee on Foreign Relations, Senate Document No. 205, Fifty-ninth Congress, though this was denied in a minority report.

A constitutional convention was called and the inhabitants of the Isle of Pines participated in the election of delegates thereto, September 15, 1900.

The convention concluded its work by October 1, 1901, and December 31, 1901, an election was held to choose governors of provinces, provincial councillors, members of the house of representatives, and presidential and senatorial electors, under

an order of General Wood of October 14, 1901, No. 218, approved by the War Department, which divided the Province of Habana into four circuits, the third being composed of several ayuntamientos, of which the Isle of Pines was one.

February 24, 1902, the electors met, chose senators, and elected Señor Palma, President, and Señor Romero, Vice President.

The government was transferred to Cuba, May 20, 1902, and in making the transfer, and declaring the occupation of Cuba by the United States and the military government of the island to be ended, the Military Governor wrote to "The President and Congress of Cuba," among other things: "It is understood by the United States that the present government of the Isle of Pines will continue as a *de facto* government, pending the settlement of the title to said island by treaty, pursuant to the Cuban constitution and the act of Congress of the United States approved March 2, 1902[1]." On the same day President Palma replied:

"It is understood that the Isle of Pines is to continue *de facto* under the jurisdiction of the government of the Republic of Cuba, subject to such treaty as may be entered into between the Government of the United States and that of the Cuban Republic, as provided for in the Cuban constitution and in the act passed by the Congress of the United States, and approved on the 2d of March, 1901." 31 Stat. 897.

At that date the Isle of Pines was actually being governed by the Cubans through municipal officers elected by its inhabitants, and a governor of the Province of Habana, councillors, etc., in whose choice they had participated. And see *Neely* v. *Henkel*, 180 U. S. 109, 117, 118.

February 16, 1903, the Senate of the United States, by resolution, requested the President "to inform the Senate as to the present status of the Isle of Pines, and what government is exercising authority and control in said island."

In reply the President submitted a report from the Secretary of War, which stated:

"The nature of the *de facto* government under which the Isle of Pines was thus left pending the determination of the title thereof by treaty is. shown in the following endorsement upon a copy of the said resolution by the late military governor of Cuba:

[Here follows the endorsement, dated February 20, 1903, · of which the following is a part:]

" 'At the date of transfer of the Island of Cuba to its duly . elected officials the Isle of Pines constituted a municipality included within the municipalities of the. Province of Habana and located in the judicial district of Bejucal. The government of the island is vested in its municipal officers, subject to the general control of the civil governor of the Province of Habana, who is vested under the constitution of Cuba with certain authority in the control of municipal affairs. Under the military government of Cuba the Isle of Pines was governed by municipal officials, subject to the general authority of the civil governor, who received his authority from the Governor General. The Isle of Pines, as it had existed under the military government, was transferred as a *de facto* government to the Cuban Republic, pending the final settlement of the status of the island by treaty between the United States and Cuba. The action taken by the military government was in accordance with telegraphic orders from the honorable the Secretary of War. The government of the island to-day is in the hands of its municipal officers, duly elected by the people under the general control of the civil governor of the Province of Habana and the Republic of Cuba. As I understand it, the government of the Isle of Pines is vested in the Republic of Cuba, pending such final action as may be taken by the United States and Cuba looking to the ultimate disposition of the island. No special action was taken to protect the interests of the citizens of the United States who have purchased property and have settled in the Isle of Pines, for the reason that no such action was necessary. All Americans in the island are living under exactly the same conditions as other foreigners,

and if they comply with the laws in force it is safe to say that they will not have any difficulty or need special protection. At the time these people purchased property they understood distinctly that the question of ownership of the Isle of Pines was one pending settlement, and in locating there they took the risks incident to the situation.' "

We are justified in assuming that the Isle of Pines was always treated by the President's representatives in Cuba as an integral part of Cuba. This was indeed to be expected in view of the fact that it was such at the time of the execution of the treaty and its ratification, and that the treaty did not provide otherwise in terms, to say nothing of general principles of international law applicable to such coasts and shores as those of Florida, the Bahamas, and Cuba. Hall, 4th ed., 129, 130; *Louisiana* v. *Mississippi,* 202 U. S. 1, 53; *The Anna,* 5 C. Rob. 273.

In August, 1902, the Treasury Department decided that duties should be assessed on goods coming from the Isle of Pines at the same rates as on similar merchandise imported from other places.

On July 2, 1903, a treaty with Cuba was signed, relinquishing any claim by the United States to the Isle of Pines under the treaty of peace, but this failed of ratification, and on March 2, 1904, another treaty was signed, which relinquished all claim of title under that treaty.

November 27, 1905, the Secretary of State wrote an American resident of the Isle of Pines:

"The treaty now pending before the Senate, if approved by that body, will relinquish all claim of the United States to the Isle of Pines. In my judgment the United States has no substantial claim to the Isle of Pines. The treaty merely accords to Cuba what is hers in accordance with international law and justice.

"At the time of the treaty of peace which ended the war between the United States and Spain, the Isle of Pines was and had been for several centuries a part of Cuba. I have no

doubt whatever that it continues to be a part of Cuba and that it is not and never has been territory of the United States. This is the view with which President Roosevelt authorized the pending treaty, and Mr. Hay signed it, and I expect to urge its confirmation."

There are some letters of an Assistant Secretary of War or written by his direction, and other matters, referred to, which we do not regard as seriously affecting the conclusion that the Executive has consistently acted on the determination that the United States had no substantial claim to the Isle of Pines under the treaty.

The only significant legislative action is found in the proviso of the act of March 2, 1901, the Army Appropriation Act (31 Stat. 895, c. 803), commonly called the Platt Amendment (897), which reads:

"Provided further, That in fulfillment of the declaration contained in the joint resolution approved April twentieth, eighteen hundred and ninety-eight, entitled 'For the recognition of the independence of the people of Cuba, demanding that the Government of Spain relinquish its authority and government in the island of Cuba, and to withdraw its land and naval forces from Cuba and Cuban waters, and directing the President of the United States to use the land and naval forces of the United States to carry these resolutions into effect,' the President is hereby authorized to 'leave the government and control of the island of Cuba to its people' so soon as a government shall have been established in said island under a constitution which, either as a part thereof or in an ordinance appended thereto, shall define the future relations of the United States with Cuba, substantially as follows:"

Then follows eight clauses, of which the sixth is:

"VI. That the Isle of Pines shall be omitted from the proposed constitutional boundaries of Cuba, the title thereto being left to future adjustment by treaty."

It appears that certain American citizens, asserting interests in the Isle of Pines, had contended that it belonged to the

United States under the treaty, and the sixth clause of the Platt Amendment, while not asserting an absolute claim of title on our part, gave opportunity for an examination of the question of ownership and its settlement through a treaty with Cuba. The Republic of Cuba has been governing the isle since May 20, 1902—the present situation need not be discussed—and has made various improvements in administration at the suggestion of our Government, but Congress has taken no action to the contrary of Cuba's title as superior to ours.

It may be conceded that the action of both the political departments has not been sufficiently definite to furnish a conclusive interpretation of the treaty of peace as an original question, and as yet no agreement has been reached under the Platt Amendment. The Isle of Pines continues at least *de facto* under the jurisdiction of the government of the Republic of Cuba, and that settles the question before us, because as the United States have never taken possession of the Isle of Pines as having been ceded by the treaty of peace, and as it has been and is being governed by the Republic of Cuba, it has remained "foreign country" within the meaning of the Dingley Act according to the ruling in *De Lima* v. *Bidwell*, 182 U. S. 1, and cases cited; *United States* v. *Rice*, 4 Wheat. 246. There has been no change of nationality for revenue purposes, but, on the contrary, the Cuban Government has been recognized as rightfully exercising sovereignty over the Isle of Pines as a *de facto* government until otherwise provided. It must be treated as foreign, for this Government has never taken, nor aimed to take, that possession in fact and in law which is essential to render it domestic.

*Judgment affirmed.*

MR. JUSTICE MCKENNA concurred in the judgment.

MR. JUSTICE WHITE and MR. JUSTICE HOLMES concurred specially.

MR. JUSTICE MOODY took no part.

Mr. Justice White, with whom was Mr. Justice Holmes, concurring.

My reasons for agreeing to the conclusion announced by the court are separately stated to prevent all implication of an expression of opinion on my part as to a subject which in my judgment the case does not require and which, as it is given me to see it, may not be made without a plain violation of my duty.

The question which the case raises, by way of a suit to recover duties paid on goods brought from the Isle of Pines, is whether that island, by the treaty with Spain, became a part of the United States, or was simply left or made a part of the Island of Cuba, over which the sovereignty of Spain was relinquished.

I accept the doctrine which the opinion of the court announces, following *Jones* v. *United States*, 137 U. S. 202, that "who is the sovereign *de jure* or *de facto* of a territory is not a judicial but a political question, the determination of which by the legislative and executive departments of any government conclusively binds the judges as well as other officers, citizens and subjects of that government." That the legislative and executive departments have conclusively settled the present status of the Isle of Pines as *de facto* a part of Cuba and have left open for future determination the *de jure* claim, if any, of the United States to the island, as the court now declares, is to me beyond possible contention. Thus, by the amendment to the act of 1891, which was enacted to determine the *de facto* position of the island and to furnish a rule for the guidance of the executive authority in dealing in the future with the island, it was expressly provided "that the Isle of Pines shall be omitted from the proposed constitutional boundaries of Cuba, the title thereto being left to future adjustment by treaty." So, also, when the Island of Cuba was turned over to the Cuban government by the military authority of the United States, that government was expressly notified by such authority, under the direction of the President, that

whilst the *de facto* position of the Isle of Pines as a part of Cuba was not disturbed it must be understood that its *de jure* relation was reserved for future determination by treaty between Cuba and the United States.  And this notification and relation was in terms accepted by the President of the Republic of Cuba.  If the opinion now announced stopped with these conclusive expressions I should of course have nothing to say.  But it does not do so.  Although declaring that the *de facto* position of the Isle of Pines as resulting from legislative and executive action is binding upon courts, and although referring to the conclusive settlement of that *de facto* status and the reservation by the legislative and executive departments of the determination of the *de jure* status for future action, the opinion asserts that it is open and proper for the court to express an opinion upon the *de jure* status, that is, to decide upon the effect of the treaty.  In doing so it is declared that all the world knew that the Isle of Pines was an integral part of Cuba, this being but a prelude to an expression of opinion as to the rightful construction of the treaty.  To my mind any and all expression of opinion concerning the effect of the treaty and the *de jure* relation of the Isle of Pines is wholly unnecessary and cannot be indulged in without disregarding the very principle upon which the decision is placed, that is, the conclusive effect of executive and legislative action.  In other words, to me it seems that the opinion, whilst recognizing the force of executive and legislative action, necessarily disregards it.  This follows, because the views which are expressed on the subject of the meaning of the treaty amount substantially to declaring that the past action of the executive and legislative departments of the government on the subject have been wrong, and that any future attempt by those departments to proceed upon the hypothesis that the *de jure* status of the island is unsettled will be a violation of the treaty as now unnecessarily interpreted.

MR. JUSTICE HOLMES concurs.