## HICHINO UYENO v. ACHESON, Secretary of State.

### No. 2154.

United States District Court
W. D. Washington, N. D.

March 23, 1951.

512

'A. L. Wirin and Fred Okrand, by A. L. Wirin, Los Angeles, Cal., for the plaintiff.

J. Charles Dennis, U. S. Atty., John E. Belcher, Asst. U. S. Atty., Seattle, Wash., for the defendant.

YANKWICH, District Judge.

Hichiro Uyeno, the plaintiff, was born in Bellevue, King County, State of Washington, on June 12, 1926, of Japanese parentage. When four and one-half years of age, in December, 1930, he was taken by his parents to Japan. His parents, after their return to Japan, engaged in farming. The father died there. The mother is still living in Japan. Of several brothers

and sisters who accompanied the family to Japan, a brother and sister returned to the United States. The Government has not challenged their claim to citizenship by reason of birth. Indeed, in 1941, the brother registered for military duty under the Selective Training and Service Act of 1940, 50 U.S.C.A.Appendix, § 301 et seq.

■ The plaintiff claims his permanent residence at Seattle, Washington, where he resides with his brother, having gained admission to the United States for the purpose of prosecuting the present action, under a "Certificate of Identity", granted on the plea of need of the physical presence of the plaintiff at the trial. 8 U.S.C.A. § 903. The issuance of such certificate does not work an estoppel against the Government. United States ex rel. Lapides v. Watkins, 2 Cir., 1948, 165 F.2d 1017, 1019. Back of the present action is the contention of the United States that the plaintiff has lost the citizenship which he acquired by birth in the United States.

## I

### The Facts Leading to the Controversy

In July, 1948, the plaintiff applied to the United States Consulate in Japan for a passport pursuant to his expressed desire to return to the United States. The application was denied upon the *sole* ground that the plaintiff was no longer a citizen or national of the United States because he had voted in the Japanese general election of 1947.

It is the plaintiff's contention that he is a citizen and national of the United States, that his participation in the general election of 1947 was forced and was under mistake and misunderstanding, because he had no knowledge that such voting would result in loss of citizenship. He asserts that, at no time, did he intend to do anything which would result in the loss or forfeiture of his United States citizenship and nationality. Upon these grounds, he instituted, on December 6, 1948, the present action against the Secretary of State, under Section 503 of the United States Nationality Code, 8 U.S.C.A. § 903.

The answer of the Government challenges the assertions of the plaintiff, except that it admits his birth in the United States, and departure to Japan, while a child of tender age.

The entire controversy, therefore, centers around the participation by the plaintiff in the Japanese general election of 1947, at which time, although under age, the plaintiff, under the rules laid down by the Supreme Commander Allied Powers (SCAP), was permitted to vote. See, Miranda v. Clark, 9 Cir., 1950, 180 F.2d 257.

And the ultimate question is: Did the plaintiff by this act expatriate himself?

## II

### What is a "Foreign State"?

■ To achieve expatriation by any of the means provided in Section 802, 8 U.S. C.A., the act must be voluntary.

"To 'expatriate' oneself clearly implies voluntary action." Dos Reis ex rel. Camara v. Nicolls, 1947, 1 Cir., 161 F.2d 860, 868.

"Expatriation is the voluntary renunciation or abandonment of nationality and allegiance. It has no application to the removal from this country of a native citizen during minority. In such a case, the voluntary action which is of the essence of the right of expatriation is lacking." Perkins v. Elg, 1939, 307 U.S. 325, 334, 59 S.Ct. 884, 889, 83 L.Ed. 1320.

And see, Attorney General of United States v. Ricketts, 9 Cir., 1947, 165 F.2d 193, 195.

We are to determine the meaning and effect of the participation of the plaintiff in the Japanese election of 1947, at which the voters of occupied Japan voted for Members of the House of Representatives, members of prefectural and village assemblies, as well as for local prefectural and village heads, in the light of the provisions of Subdivision (e) of Section 801 of Title 8 U.S.C.A., which enumerates as one of the actions from which a presumption of loss of United States nationality will arise: "(e) Voting in a political elec-

tion in a foreign state or participating in an election or plebiscite to determine the sovereignty over foreign territory". Since the termination of hostilities with Japan, many cases of this character have arisen and a rather extensive jurisprudence has developed in the lower courts. The latest published opinion on the subject,—that by Judge McLaughlin in Fujiko Furusho v. Acheson, D. C. Hawaii, 1951, 94 F.Supp. 1021,—contains a complete list of the published opinions. They need not be reviewed here.

■■■ The aim of the Congress in enacting Section 801, 8 U.S.C.A., was to enumerate certain general means of losing United States nationality. These means range from acts of treason, Section 801(h), and desertion of military forces in time of war, Section 801(g), or departure from the United States in time of war or national emergency for the purpose of evading service in the Armed Forces of the United States, Section 801(j), to expression of allegiance by participation in elections in the foreign state, Section 801(e). See, Savorgnan v. United States, 1950, 338 U.S. 491, 70 S.Ct. 292, 94 L.Ed. 287; Bauer v. Clark, 7 Cir., 1947, 161 F.2d 397. By choosing participation in elections as a means of losing citizenship, the Congress of the United States did not intend to endow the act itself with any particular significance. The Congress designated participation in elections, because such act indicates a desire on the part of the participant to make himself a part of a government by assisting in the choice of those who are, by this mandate, to govern its affairs. The participation in an election is merely one method of expressing one's allegiance to the State in which the election is held. And the Report of the President's Cabinet Committee on the Nationality Act, which prepared the revision of the nationality laws of the United States, gave this interpretation to the suggested provision which later became Section 801 (e): "Taking an active part in the political affairs of a foreign state by voting in a political election therein is believed to involve a political attachment and practical allegiance thereto which is inconsistent

with continued allegiance to the United States, whether or not the person in question has or acquires the nationality of the foreign state. In any event, it is not believed that an American national should be permitted to participate in the political affairs of a foreign state and at the same time retain his American nationality. The two facts would seem to be inconsistent with each other." (Report, President's Cabinet Committee on Nationality Act, House Committee Report, 76th Congress, 1st session, p. 67). See, John P. Roche, The Loss of American Nationality, 1950, 99 U. of Pa.Law Rev. 25, 52–54.

The Supreme Court has called voting one of the "per se acts of expatriation" which lack of intent to abandon American citizenship "could not offset". Savorgnan v. United States, 1950, 338 U.S. 491, 501, Note 17, 70 S.Ct. 292, 297. This is in line with the strict policy of the United States which has favored naturalization, has disapproved dual nationality and has recognized only such "temporary or limited duality of citizenship" as arises "inevitably from differences in the laws of the respective nations as to when naturalization and expatriation shall become effective." Savorgnan v. United States, supra, 338 U.S. at page 500, 70 S.Ct. at page 297.

■ An American national, who undergoes naturalization according to the law of a foreign country, knows that his Government will not question his surrender of American allegiance. This is contrary to the attitude of many countries, which, despite renunciation of allegiance, have asserted certain rights against their former nationals, such as the right to induct them into military service, despite attempted change of nationality, and to punish them for failure to respond to induction, even after naturalization. See, Podea v. Acheson, 2 Cir., 1950, 179 F.2d 306. Consistently, the United States has refused to aid its naturalized citizens who, upon return to the land of their birth, were made to suffer punishment for failure to perform obligatory military service. And so, Subdivision (e) under consideration is but one of the forms in which this distaste of the United States Government for dual al-

legiance has expressed itself. The entire section of which Subdivision (e) is a part, and the facts in the case must be gauged by this governmental policy.

■ So doing, it is obvious that the words "foreign state" are not words of art. In using them, the Congress did not have in mind the fine distinctions as to sovereignty of occupied and unoccupied countries which authorities on international law may have formulated. They used the word in the sense of "otherness". When the Congress speaks of "foreign state", it means a country which is not the United States or its possession or colony,—an alien country,—other than our own, bearing in mind that the average American, when he speaks of a "foreigner" means an alien, non-American.

And this is the way in which Courts have urged us to interpret congressional terminology. Illustrative is the use of the words "white person", in legislation dealing with eligibility to naturalization. 8 U.S.C.A. § 703. The courts sustained the popular meaning which makes the word equivalent to "Caucasian" as against the anthropological, scientific meaning which would have made Hindus eligible to citizenship. United States v. Bhagat Singh Thind, 1923, 261 U.S. 204, 214, 43 S.Ct. 338, 67 L.Ed. 616. And see, Morrison v. People of State of California, 1934, 291 U.S. 82, 86, 54 S.Ct. 281, 78 L.Ed. 664. So here, the interpretation called for is that of common speech and not that derived from abstract speculation on sovereignty as affected by foreign military occupation. Such abstraction would make out of present-day Japan a "no-man's land", neither a part of America, nor a part of the domain of the allied nations occupying it for pacification purposes. However, if Japan is considered as a "foreign state" in the accepted popular sense, which also has sanction in international law, it has a *distinct being,* separate and apart from the occupying powers, and capable of commanding allegiance which is incompatible with American nationality. Because of such incompatibility, the Congress must have considered it in this sense, —when it designated participation by an American national in a political election in a "foreign state" as one of the means of losing his American nationality. And the State Department has so interpreted it.

■ For these reasons, I am in disagreement with the cases on the subject, including Arikawa v. Acheson, D.C.Cal., 1949, 83 F.Supp. 473, and Fujiko Furusho v. Acheson, D.C.Hawaii, 1951, 94 F.Supp. 1021, which, by stressing the military control of Japan, insist that, *as an occupied country,* Japan is not a foreign state. There is sound international authority for the view that military occupation of a country does not *ipso facto* terminate the life of the country as a separate entity. For, unless by the conquest, the state is absorbed into another state or is dissolved, its existence continues. As said in Lehigh Valley R. Co. v. State of Russia, 2 Cir., 1927, 21 F.2d 396, 400–401: "The state is a community or assemblage of men, and the government the political agency through which it acts in international relations. State of Texas v. White, 7 Wall. 700, 19 L.Ed. 227; Cherokee Nation v. [State of] Georgia, 5 Pet. [1] 52, 8 L.Ed. 25; Foulke, International Law, vol. 1, pp. 62, 82, 102, 192. The foreign state is the true or real owner of its property, and the agency the representative of the national sovereignty. The Sapphire, supra [11 Wall. 164, 20 L.Ed. 127]; The Rogdai, D.C., 278 F. 294. * * *

*"It is for the executive and legislative departments to say in what relations any other country stands toward it. Courts of justice cannot make the decision. * * * And,* unless the political department of our government has decided otherwise, the judiciary recognizes the condition of things with respect to another country which once existed, and is still subsisting because of no other recognition. * * * *the state is perpetual, and survives the form of its government."* (Emphasis added.)

And see, 1 Hackworth, Digest of International law, 1940, Sec. 25, p. 127; 1 Oppenheim's International Law, 7th Ed., 1948, Secs. 80–82, pp. 150–158. If we were dealing with an ancient type of occupation, which resulted in the dissolution of the

516

defeated power and its complete absorption by the victor, it might well be argued that such occupation effectively destroyed the existence of the conquered country and made it a part of the territory of the conqueror. But neither the United States nor the powers allied with it in occupying Japan did, or intended to, dissolve Japan as a unit, or make it a part of the United States, or of the group of nations which the allied occupation represents. Indeed, the Emperor of Japan was allowed to remain as titular head of the State. Certain changes were made in the structure of its Government by a Constitution which conformed to the desires of the conquerors. But the life of the nation as such went on with its language, customs, mores, family institutions and even local instrumentalities of Government. The latter, of course, modified by the exigencies of the new Constitution. So that, regardless of any abstract theorizing about the effect of military occupancy upon a conquered nation, the fact remains that the allied authorities have not, and do not intend to, dissolve Japan as an entity and absorb it into some other yet unnamed entity. Rather, Japan is to be returned to its inhabitants, to whom it belongs, after a temporary trusteeship. See, Neely v. Henkel, 1901, 180 U.S. 109, 115, 120, 21 S.Ct. 302, 45 L.Ed. 448. To hold that, by the mild type of occupation, Japan ceased to be a foreign state, is, to my mind, unwarranted by the realities of the occupation, as well as those recognized rules of international law which determine the essence of statehood. See, 1 Hyde, International Law, 1940, Second Revised Edition, sec. 7, pp. 22–23. More, as already stated, the Congress of the United States, by using the phrase "foreign state", meant to indicate a country other than our own, actions as to which might result in loss of nationality because it evidenced the allegiance which the United States has so consistently considered the essence of nationality.[1]

So that the conclusion is warranted that in 1947, when the plaintiff voted in the Japanese elections, Japan was a "foreign state" within the meaning of Section 801(e). See, Neely v. Henkel, supra, at page 115, 21 S.Ct. 302; Pearcy v. Stranahan, 1907, 205 U.S. 257, 265–272, 27 S.Ct. 545, 51 L.Ed. 793; Burnet v. Chicago Portrait Co., 1932, 285 U.S. 1, 5–7, 52 S.Ct. 275, 76 L.Ed. 587.

### III

### The Elections of 1947 in Japan Were Political Elections

I am equally convinced, from the study of the entire record, that the 1946 elections had a consultative effect only, and that the conditions under which they were held, and the limitations placed upon choice with right of totally annuling their effect made them no more than "a plebiscite", which the Occupation Authorities could set aside. The 1946 election may well have been what some of the documents emanating from the Supreme Command called it,—an exercise in democratic voting. However, the 1947 election had all the characteristics of finality, which attaches to any election under the democratic pro-

---

1. The meaning of phrases like "foreign country" and "foreign state" must be determined by reference to the purpose of the particular statute. In Burnet v. Chicago Portrait Company, 1932, 285 U.S. 1, 5–6, 52 S.Ct. 275, 277, 76 L.Ed. 587, the Supreme Court, speaking of the word "country" in the expression "foreign country", indicated the variety of meanings which it may have, saying: "In the sense of territory, it may embrace all the territory subject to a foreign sovereign power. When referring more particularly to a foreign government, *it may describe a foreign state in the international sense, that is, one that has the status of an international person with the rights and responsibilities under international law of a member of the family of nations;* or it may mean a foreign government which has authority over a particular area or subject-matter, although not an international person but only a component part, or a political subdivision, of the larger international unit. The term 'foreign country' is not a technical or artificial one, and the sense in which it is used in a statute must be determined by reference to the purpose of the particular legislation." (Emphasis added.)

cess. It was a "final choice of an officer by the duly qualified electors." Newberry v. United States, 1921, 256 U.S. 232, 250, 41 S.Ct. 469, 472, 65 L.Ed. 913. And see, United States v. Classic, 1941, 313 U.S. 299, 217–320, 61 S.Ct. 1031, 85 L.Ed. 1368; Smith v. Allwright, 1944, 321 U.S. 649, 664–666, 64 S.Ct. 757, 88 L.Ed. 987; Klein v. United States, 8 Cir., 1949, 176 F.2d 184, 187, in which primaries, which merely designate nominees, are treated as "elections". And see, 29 C.J.S., Elections, §§ 1–2. They were political in character because they were held, as stated by the Chief of the Parliamentary and Political Division of the Government Section, SCAP, Justin Williams, "for the purpose or in connection with the administration of public affairs." They concerned all political units, wards, villages, towns and prefectures. In all, except the Agricultural Land Committees, the same official electoral lists were used,—all in accordance with Japanese law and procedure. In truth, it was the aim of the Occupation Authorities that the electoral machinery for the conduct of this election should be entirely in the hands of the Japanese Government. A list of candidates at both national and local levels was presented with the right to choose between rival candidates. The candidates receiving pluralities were declared elected. Most important, and despite the power to annul the result, there is no evidence to indicate that the functionaries chosen at these elections by the voters *were not permitted to assume office and to function.* The contrary, in fact, appears. So that, here too, the question is to be determined not on the basis of possibilities, not by considering what the occupation powers could have done to annul the result of the election and substitute their own wish and will for it, *but from what they did.* And the record indicates that the result of the election was permitted to stand and the people for whom the majority of the voters voted were actually allowed to assume their offices and to perform their duties.

### IV
### The Participation of the Plaintiff Was Involuntary

This conclusion calls for a consideration of the final ground on which the refusal of the passport is defended, namely, that the participation of the plaintiff in the election was voluntary. This is purely a question of fact. The plaintiff was before the court and testified at length about the circumstances under which he was coerced into voting.

The Government, as a part of its case, presented certain declarations of his, which, it is insisted, contradict his present contention that his vote was involuntary.

▆ I believe the entire stress of the Government lies in the fact that the plaintiff, while saying in these statements made in Japan, that he was *obliged* to vote, he elsewhere states that he was not *forced.* There is no indication that, in the original Japanese, there is any greater distinction between the words than in their English equivalents. The plaintiff, in the explanation he gave, showed clearly that what he was denying was the use of physical force on him. He was not denying duress as recognized in our law. If physical force were necessary to prove the act to be involuntary, the conclusion would be unavoidable that there was none. But our Court of Appeals in Acheson v. Murakami, 9 Cir., 1949, 176 F.2d 953, and other courts have held that there may be a type of public coercion which renders an act involuntary, *although it does not stem from the use of force.* See, Fujizawa v. Acheson, D.C.Calif., 1949, 85 F.Supp. 674.

The dividing line between voluntary action and coercion is not always easy to draw. However, the Court of Appeals for the Third Circuit has indicated how it is to be done: "If by reason of extraordinary circumstances amounting to true duress, an American national is forced into the formalities of citizenship of another country, the *sine qua non* of expatriation is lacking. There is not authentic abandonment of his own nationality. His act, if it can be called his act, is involuntary. He cannot be truly said to be manifesting an intention of renouncing his country. On the other hand it is just as certain that the forsaking of American citizenship, even in a difficult situation, as a matter of expediency, with attempted excuse of such conduct later when crass material con-

siderations suggest that course, is not duress." Doreau v. Marshall, 3 Cir., 1948, 170 F.2d 721, 724.

In the present case, the testimony of the plaintiff is that the constant reiteration through newspapers and over the radio, and by friends and advisers of the importance of voting and the need for voting was taken by him as "a command" on the part of General MacArthur and the Occupation Forces to vote, *which he could not, with impunity, disobey*. Indeed, he testified that, in addition to this, he was led to believe that if he did not vote, he would lose his food ration card. The essential foods on which the Japanese diet is based,—rice, soy, sugar, and the like,— were on the ration list. It is inconceivable that anyone could have remained alive in occupied Japan if he had been deprived of the means of lawful access to these staples. Singly, and together, these pressures, as envisoned by the plaintiff, are the real sources of his action. Motive does not, necessarily, detract from the nature of a voluntary act. But the facts we are considering go beyond mere motive. They are of a character which shows that the pressures exercised upon the plaintiff were so great that his participation in the election was not his voluntary act. I feel that the Consul, in his finding, and the Department, in endeavoring to sustain it, have, unconsciously perhaps, stressed too much the absence of an act of physical coercion. But, in the realm of human action, modern psychology teaches us that group and individual pressures acting upon the needs of a person may be so overpowering in their nature as to overcome individual will and accomplish what physical violence could not.

Difficulties arise when courts are called upon to determine whether an act is or is not voluntary. Mr. Justice Jackson, some years ago, pointed to this difficulty. Speaking for the Court, in Gregg Cartage & Storage Co. v. United States, 1942, 316 U.S. 74, 79–80, 62 S.Ct. 932, 935, 86 L.Ed. 1283, he wrote: "How far one by an exercise of free will may determine his general destiny or his course in a particular matter and how far he is the toy of circumstance has been debated through the ages by theologians, philosophers, and scientists. Whatever doubts they have entertained as to the matter, the practical business of government and administration of the law is obliged to proceed on more or less rough and ready judgments based on the assumption that mature and rational persons are in control of their own conduct."

In seeking an answer to each individual problem, courts recognize as duress facts and circumstances which, by strict common law, would not have been considered such. Thus, recognition has been given, in our complex society, to "business" or "economic compulsion". Such compulsion may *actually* exist despite the *appearance* of freedom of choice. See, The Eliza Lines, 1895, 199 U.S. 119, 130–131, 26 S.Ct. 8, 50 L.Ed. 115; Union Pacific Ry. Co. v. Public Service Commission, 1918, 248 U.S. 67, 70, 39 S.Ct. 24, 63 L.Ed. 131; Altvater v. Freeman, 1943, 319 U.S. 359, 365, 63 S.Ct. 1115, 87 L.Ed. 1450; 17 Am.Jur., Contracts, Secs. 6, 7. And courts, taking a realistic view of the problem of stress, have permitted persons to avoid the consequence of a contract where, as a condition precedent to the right to question a particular act of an individual or governmental agency, the person had to comply or go out of business. See, Atchison, etc., Ry. Co. v. O'Connor, 1912, 223 U.S. 280, 32 S.Ct. 216, 56 L.Ed. 436; Union Pacific Ry. Co. v. Public Service Commission, 1918, 248 U.S. 67, 69–70, 39 S.Ct. 24, 63 L.Ed. 131; Oceanic Steam Nav. Co. v. Stranahan, 1909, 214 U.S. 320, 321, 29 S.Ct. 671, 53 L.Ed. 1013; Altvater v. Freeman, supra. Or, where contracts were entered into under threat of strikes. 17 Am.Jur., Duress and Undue Influence, Sec. 7. Or there were other forms of actual threats which resulted in a person parting with property or money in order to avoid a greater harm or penalty. See, Rose v. Owen, 1908, 42 Ind.App. 137, 85 N.E. 129; Parmentier v. Pater, 1885, 13 Or. 121, 9 P. 59; Young v. Hoaglund, 1931, 212 Cal. 426, 298 P. 996, 75 A.L.R. 654; St. Louis & S. F. Ry. Co. v. Gorman, 1909, 79 Kan. 643, 100 P. 647, 28 L.R.A.,N.S., 637.

If apprehended property or business loss from threatened acts of the type enumerated is sufficient to make the transaction which it induced involuntary, how much more overpowering is the compulsion of fear of loss of freedom of action, and the fear of hunger and deprivation consequent upon loss of "good standing" with an occupation establishment having the means of influencing and controlling not only one's freedom of action, but the very process of obtaining one's means of subsistence. The will to survive is the strongest instinct of human nature. Courts have justified homicide when committed under circumstances which led a reasonable person to believe that his own life was in danger unless he took the life of another. In re Neagle, 1890, 135 U.S. 1, 69, 10 S.Ct. 658, 34 L.Ed. 55; Beard v. United States, 1895, 158 U.S. 550, 558–563, 15 S.Ct. 962, 39 L.Ed. 1086; Brown v. United States, 1921, 256 U.S. 335, 343, 41 S.Ct. 501, 65 L.Ed. 961.

The philosophy of these cases was summed up by Mr. Justice Holmes in Brown v. United States, supra, in one pithy sentence: "Detached reflection cannot be demanded in the presence of an uplifted knife." 256 U.S. at page 343, 41 S.Ct. at page 502. Courts place the source of the right of survival at the risk of another's life, in nature. 40 C.J.S. Homicide, §§ 114–119. It is, in reality, a part of that "reverence for life", to use Albert D. Schweitzer's phrase, which is at the basis of our civilization. See, Yankwich, The Nature of Our Freedom, 1950, p. 1.

Because of it, many compulsions which act on the will to live, are given sanction. Behind all these rulings lies the recognition of the fact that a great variety of stresses and compulsions, dissociated from actual physical force and the fear or threat of such may be as threatening as "the uplifted knife", may make the "detached reflection" of which Mr. Justice Holmes speaks, impossible, and may render involuntary actions which, at first blush, may appear to be the result of freedom of choice. Back of all this is man's urge for self-preservation of which it has been said: "We know of no more universal instinct than that of self-preservation,—none that

so insistently urges to care against injury. It has its motives to exercise in the fear of pain, maiming, and death." Baltimore, etc., Ry. Co. v. Landrigan, 1903, 191 U.S. 461, 474, 24 S.Ct. 137, 140, 48 L.Ed. 262. And Lord Coleridge, C. J., in rendering his judgment in the famous English cannibalism case, Regina v. Dudley and Stephens, 1884, Q.B.D., 52 Law Times 107, 113, while declining to recognize necessity as a ground for the homicide in the particular circumstances, conceded that "To preserve one's life is generally speaking, a duty."

■■■ This is especially true in the case before us. We are not confronted with an adult who, given a deliberate choice between acts which express allegiance to the United States or allegiance to a foreign country, makes a free choice, with full knowledge, and who, under the circumstances, should be held to its consequences. On the contrary, we are dealing with an immature young man,—an American-born Japanese,—whose citizenship was conferred on him by the 14th Amendment to the United States Constitution. See, United States v. Wong Kim Ark, 1898, 169 U.S. 649; 18 S.Ct. 456, 42 L.Ed. 890; Morrison v. People of State of California, 1934, 291 U.S. 82, 85, 54 S.Ct. 281, 78 L.Ed. 664. Taken to Japan at the age of four and one-half years, he was, without consultation, educated like a Japanese child. At no time after reaching maturity was he requested to make a choice indicating his allegiance to the United States. As a student in the technical school, he worked part-time in a factory which manufactured products which were probably used in the war effort. He learned as much English as he was taught in school, having forgotten whatever English he may have picked up in his childhood before leaving for Japan. In 1941, he expressed a desire to go to the United States. Although his parents did not object, he could not obtain passage. It is also significant that a brother and sister, evidently older, made their way to the United States before the beginning of the war, and their right to claim American citizenship was not challenged. Indeed, as stated before, the

brother returned to the State of Washington and registered for the draft under the Selective Service Act of 1940. There is nothing in the action of the plaintiff from which any inference of deliberate choice of allegiance to another country could be inferred. See, Podea v. Acheson, 2 Cir., 1950, 179 F.2d 306.

 The Government based its denial of the passport *solely* upon the act of voting. The law does not require the American-born child of alien parents to do anything during his minority. See, Perkins v. Elg, 1939, 307 U.S. 325, 329–334, 59 S.Ct. 884, 83 L.Ed. 1320. It allows a period of two years after attaining majority to take steps to show his resumption of American nationality by returning to the United States and "acquiring permanent residence" therein. 8 U.S.C.A. § 801(a). The Government contends that the two-year period has expired. This may be true. But within the two-year period, the plaintiff did assert his American nationality by claiming the right to a passport, which would have enabled him to return to the United States. The Government rejected this plea. It is continuing to block it by resisting this suit. The plaintiff is in the United States under a "Certificate of Identity", which permits his stay pending the outcome of this litigation. And the Government cannot, in justice, be allowed to claim that, because it has, *successfully thus far,* thwarted his efforts to gain recognition of his citizenship, the statute of limitations has run. Even if it be assumed that there were other means than the one chosen by the plaintiff,—demand for a passport,—to secure recognition of his citizenship, it may be assumed that the Government would have resisted those efforts as it is resisting the present one.

It is a fundamental rule of equity jurisprudence that he who prevents the exercise of a right by another cannot insist that the right was lost during the period in which its exercise was prevented by him or by order of court. This is also true where the act is prevented by "paramount authority". Thus, a person who prevents the enforcement of a right through injunctive process or other court action, cannot claim, at the same time, that the statute of limitations has run against the right during the period of restraint, in which, by his action, he prevented enforcement. 54 C.J.S., Limitations of Actions, §§ 252–253; see, Elliott & Horne v. Chambers Land Co., 1923, 61 Cal.App. 310, 312, 215 P. 99, 100, the opinion in which was written by our late colleague, Judge William P. James, when he was a member of the California District Court of Appeal.

Here, the Government, itself,—to use Judge James' phrase,—is "the paramount authority" which, up to now, has prevented the recognition of American nationality which the plaintiff sought to assert. See, 54 C.J.S., Limitations of Actions, §§ 251, 253.

It is, therefore, not in a position to urge any delay which its own restraining action has induced as a bar to the relief here sought.

Judgment will, therefore, be for the plaintiff.