THE ST. LOUIS & SAN FRANCISCO RAILROAD COMPANY
v. THOMAS GORMAN.

No. 15,881. (100 Pac. 647.)

SYLLABUS BY THE COURT.

1. CONTRACTS—*Definiteness—Agreement to Make a Contract.* An agreement to make a contract in the future is not binding unless all the terms and conditions are agreed upon and nothing is left to future negotiations.

2. ——— *Agreement to Sign Special Contract Limiting Carrier's Common-law Liability.* Under the facts of this case it can not be said as a matter of law that a shipper of cattle bound himself by preliminary negotiations relating to the

shipment to sign a special written contract limiting the carrier's common-law liability.

3. ——— *Same.* If preliminary negotiations relating to a shipment of cattle have not resulted in a valid agreement that it shall be made under a special written contract the shipper may rightfully refuse to sign such a contract, although he knows the custom of the carrier to require written contracts, in the course of a long experience as a shipper has always signed written contracts, and following the negotiations intended to sign a contract of the kind he had been using for the shipment in question.

4. ——— *Duress.* A special written contract limiting a carrier's common-law liability which has been extorted from a shipper who rightfully declined to sign it, by means of a refusal to transport cattle already in the carrier's possession unless such a contract was signed, is voidable at the shipper's election.

5. ——— *Affirmance of Voidable Contract—Duress.* A party may not voluntarily act upon a contract which he has been wrongfully constrained to sign and voluntarily take the benefit of it and then avoid it for duress. But conduct exhibited in apparent recognition of the contract while the pressure of the hardship which overcomes the mind continues will not amount to an affirmance; and to constitute an affirmance the conduct of the injured party must be such as to indicate an intention to condone the wrong and a purpose to abide by its consequences.

6. ——— *Same.* Under the facts of this case it can not be said as a matter of law that the acceptance and use of a return pass by a shipper of stock after the stock had been transported and delivered confirmed a voidable contract with the carrier under which the shipment was made, and which provided for such pass.

Error from Bourbon district court; WALTER L. SIMONS, judge. Opinion filed March 6, 1909. Affirmed.

*W. F. Evans,* and *R. R. Vermilion,* for plaintiff in error.

*A. M. Keene,* and *E. C. Gates,* for defendant in error.

The opinion of the court was delivered by

BURCH, J.: The defendant is a common carrier operating a line of railroad running northward through Godfrey, Fort Scott and Fulton to Kansas City, Mo.

The plaintiff is a stockman who resides at Fulton, north of Fort Scott, and who keeps cattle at Godfrey, south of Fort Scott. The defendant has no office or agent at Godfrey. Desiring to ship several car-loads of cattle from Godfrey to Kansas City, the plaintiff made a verbal arrangement to do so with the defendant's agent at Fulton. The arrangement was that cars would be placed at Godfrey which the plaintiff would load in time to be taken by a certain train, the plaintiff would go with the cattle to Fort Scott, the defendant would have a shipping contract prepared and ready for signature when the train arrived there, and the plaintiff and his cattle would go through to Kansas City on the train taking them from Godfrey. The plaintiff had been a regular shipper of cattle for years, knew it was the custom to require shippers to sign written contracts, and had always signed written contracts, but he had never scrutinized and was not familiar with their provisions. He did not discuss rates or terms with the agent at Fulton, or the conditions of the contract which would be in waiting for him. He did not know what the terms would be, but he expected when he reached Fort Scott to be presented with, and intended to sign, just such a written contract as he had been in the habit of shipping under.

The cattle were loaded and transported to Fort Scott as contemplated. At Fort Scott the defendant had no contract in readiness for signature, no agent at the station, and after diligent effort the plaintiff could find nobody with authority to bill his cattle. The train conductor could not take the cattle without proper papers, and the cars containing them were cut out of the train over the plaintiff's objection and protest, were placed on a side-track, and the train proceeded to Kansas City without them. The day was hot and sultry, and for several hours the cattle were switched and bumped about the yards, frequently with much violence, or were left standing between lines of other cars so that they suffered greatly from heat, with the result that they

were seriously injured. The plaintiff followed them about, getting up those which were knocked down, and otherwise doing what he could to protect them.

The plaintiff finally found an agent, who made out a contract and presented it for signature. The plaintiff was not apprised of its terms, was offered no choice of rates, and was given no option as to conditions of liability on the part of the defendant. He might have read the instrument but did not. He recognized it as a railroad live-stock contract like the kind he had been using, but he was not familiar with what it contained. He told the agent the condition the cattle were then in and refused to sign. The agent refused to allow the cattle to be shipped unless the plaintiff signed the paper tendered. Having no alternative, the plaintiff affixed his signature, so that he could get his cattle to market. A few hours afterward the cattle were placed in a train which took them to Kansas City. When put upon the market one animal could not be sold, and five others were weighed back after sale because of broken ribs and bruises.

The contract which the plaintiff signed required him to attend and unload his cattle at his own risk and expense. It contained provisions, with which he did not comply, which were conditions precedent to the recovery of damages for the injuries sustained. It also provided for his transportation. He went to Kansas City on the train with the cattle, and at Kansas City surrendered the contract to the defendant and received a pass to his home, which he used.

The plaintiff sued the defendant for damages, counting upon the common-law liability which attached to the delivery of the cattle to the defendant under the verbal arrangement with the agent at Fulton. The defendant answered setting up the written contract and pleading non-compliance with its conditions. The plaintiff replied that the writing was signed under duress. The case was submitted on testimony showing the foregoing among other facts. The court instructed

the jury respecting the common-law liability of the defendant in the absence of special contract and respecting its limited liability under the written contract, and submitted to the jury the question whether the written contract was signed under such freedom from constraint that it governed the rights of the parties. The defendant excepted, but made no request for other instructions. The jury found for the plaintiff, and the defendant prosecutes error.

The defendant argues that when the written contract was signed it superseded all oral negotiations and fixed the rights of the parties. It is said that when the plaintiff signed the contract he did only what he intended to do from the beginning and what he agreed to do at the beginning, and hence that the coercion of the agent at Fort Scott can be given no legal effect.

It is not necessary to cite authorities upon the proposition that if the plaintiff freely and voluntarily signed the contract—assuming it to be one which the law will permit—it measures the rights of the parties. The oral arrangement would be at an end, and the plaintiff would be in no position to avoid the force of the limitations placed upon the carrier's liability by the writing. It may be assumed that if the plaintiff legally bound himself at Fulton to execute the precise contract which was presented to him at Fort Scott the claimed coercion was without legal influence. But if the plaintiff rested under no legal obligation to sign that contract he could abandon his original intention and refuse to do so; and if the original intention to sign was rightfully abandoned any subsequent assent to the terms of the contract would have to be obtained without coercion or it would not bind.

In calling upon this court to declare that the plaintiff irrevocably bound himself to sign the very instrument he did sign the defendant raises a question of fact which he should have asked to have submitted to the jury under proper instructions. There is no evidence that the defendant had a standard form of con-

tract which it invariably used, and which therefore was in the plaintiff's mind. The contract upon which the defendant relies had the following heading:

"St. Louis & San Francisco Railroad Company.
Read this contract carefully, as numerous changes have
been made."

How long this form had been in use does not appear, and it can not be said the plaintiff had any of its provisions in mind. True, the plaintiff recognized the contract as a railroad live-stock contract like the ones he had been using and such as he expected to sign, but taking all of his evidence into consideration a jury would have the right to find that his identification extended no further than to the genus. A man may recognize a trust deed or coupon bond as such and know nothing of its contents, and he may agree to execute such a bond and to secure it by such a deed without agreeing upon any single condition to be inserted in either. All the plaintiff said must be weighed to ascertain its true purport. Statement qualifies statement, and reconciliation is a jury function.

Except that the plaintiff identified this contract as like those he had previously used, which to the jury might have meant nothing, there is no evidence of usual stipulations or customary conditions with which the plaintiff should have been familiar from his previous experience and which should have been in mind; and except as indicated there is no evidence that this contract was of a regular, usual or customary kind. The court is not inclined to declare as a matter of law that a shipper who delivers stock to a carrier for transportation with the understanding that a written contract will be signed intends or binds himself to submit to every condition the carrier may see fit to impose. Under these circumstances the jury would have been justified in finding that the plaintiff simply agreed to agree upon a contract when he reached Fort Scott; and it is elementary law that unless an agreement to make

a future contract be definite and certain upon all the subjects to be embraced it is nugatory.

·"A contract between two persons, upon a valid consideration, that they will, at some specified time in the future, at the election of one of them, enter into a particular contract, specifying its terms, is undoubtedly binding, and upon a breach thereof the party having the election or option may recover as damages what such particular contract, to be entered into, would have been worth to him, if made. But an agreement that they will in the future make such contract as they may then agree upon amounts to nothing. An agreement to enter into negotiations, and agree upon the terms of a contract, if they can, can not be made the basis of a cause of action. There would be no way by which the court could determine what sort of a contract the negotiations would result in; no rule by which the court could ascertain whether any, or, if so, what, damages might follow a refusal to enter into such future contract. So, to be enforceable, a contract to enter into a future contract must specify all its material and essential terms, and leave none to be agreed upon as the result of future negotiations. . . . Where a final contract fails to express some matter, as, for instance, a time of payment, the law may imply the intention of the parties; but, where a preliminary contract leaves certain terms to be agreed upon for the purpose of a final contract, there can be no implication of what the parties will agree upon." (*Shepard v. Carpenter,* 54 Minn. 153, 155, 156, 55 N. W. 906.)

Such being the law and the state of the case, it can not be said that the plaintiff rested under a legal duty to sign the writing in controversy. He was free to refuse to commit himself to any specific agreement. He did refuse, and the Fulton arrangement was then at an end so far as the execution of a shipping contract was concerned.

The law required the defendant to accept the plaintiff's stock for transportation without obliging him to agree to sign a special contract and without coercing him into signing a special contract. A special contract limiting the carrier's common-law liability must be

freely and fairly made or the shipper may repudiate it, and a refusal to transport stock unless the shipper signs a special contract destroys freedom of consent.

"Such a contract, however, must be freely and fairly made with the railroad company—not exacted as a condition precedent of shipment. Railroad companies can not arbitrarily fix any valuation on the property of the shipper, or arbitrarily demand or exact the execution of a contract limiting the common-law liability. (*K. P. Rly. Co. v. Nichols*, 9 Kan. 236, 12 Am. Rep. 494.) If a railroad company has two rates for the transportation of goods or stock—one if the goods or stock are carried under the common-law liability, and the other if carried under a limited or special contract—the shipper must have real freedom of choice. He can not be denied the right to have his goods carried by the carrier under its common-law liability; but if he desires, and if the statute permits and public policy does not forbid, he may enter into a special contract with the carrier limiting the common-law liability. . . . But a common carrier can not exact of a shipper his signature to a special contract limiting the common-law liability as a condition precedent of shipping or transporting stock, because, in such a case, the carrier resorts to unfair means. A contract thus exacted is not freely and fairly entered into." (*A. T. & S. F. Rld. Co. v. Dill*, 48 Kan. 210, 212, 214, 29 Pac. 148.)

This being true, the contract pleaded in the answer. was voidable at the plaintiff's election.

The defendant claims that the plaintiff affirmed the contract by surrendering it at Kansas City and procuring free transportation to his home. It is undisputed law that a party may not voluntarily act upon a contract which he has been constrained to sign and voluntarily take the benefit of it and then avoid it for duress. The rules applicable to the rescission of contracts on the ground of fraud apply. But things done in apparent recognition of the contract while the pressure of the hardship which overcomes the mind continues will not amount to an affirmance. The influence of the duress must be removed before conduct becomes voluntary, and after that acts charged as constituting a con-

firmation must be such as to indicate an intention to condone the wrong and a purpose to abide the consequences. Numerous decisions illustrate these principles. In the case of *Montgomery v. Pickering,* 116 Mass. 227, a vendee fraudulently obtained a bond for a deed and a sum of condemnation money for a part of the property. With full knowledge of the fraud and of her rights the vendor executed a deed pursuant to the bond. Afterward she brought suit to set aside the conveyance. The opinion reads:

"The deed in question does not expressly confirm the validity of the previous contract. It was not founded on any new consideration, or given in settlement of a disputed claim. It was required by the terms of the original contract, and there is nothing to show an intention to forgive the fraud. To have effect as a confirmation, such deed must appear to have been given with that intention by one who was not under the influence of the previous transaction. When relied on as a defense in a case where fraud is clearly established, it is said that it must stand upon the clearest evidence, because the act is so inconsistent with justice and so likely to be connected with the fraud. *Morse v. Royal,* 12 Ves. 355, 373. The deed must be so disconnected with the previous dealings as to leave the grantor the complete power of determining, as upon an original act, whether he will do it or not. *Crowe v. Ballard,* 1 Ves. Jr. 215. Or, as it is said in the more recent case of *Moxon v. Payne,* L. R. 8 Ch. 881, the parties must be at arms' length and stand on equal terms." (Page 230.)

In the case of *Rau v. Von Zedlitz,* 132 Mass. 164, the syllabus reads:

"If a woman on the eve of her marriage is induced by threats of the imprisonment of her intended husband, and by undue influence and fear that her marriage will otherwise be prevented, to sign an agreement to pay the debts of her intended husband, the agreement can not be enforced in equity; and a part payment by her, after signing the agreement, on legal proceedings being threatened and in ignorance of her rights, is not in equity a ratification of the agreement.

"If a woman, induced by undue influence, signs an agreement to pay a debt of her intended husband, the

fact that the creditor forbore to sue the original debt and to arrest the debtor and that the woman thereby obtained a husband and a title will not prevent the woman from setting up the defense of undue influence when the creditor seeks to enforce the contract in equity."

In the opinion it was said:

"But to constitute a confirmation the acts must have been done with that intention by one who was not under the influence of the previous transaction; *Montgomery v. Pickering,* 116 Mass. 227, and cases cited; and with a knowledge of its invalidity." (Page 168.)

In the case of *Leflore County v. Allen,* 80 Miss. 298, 31 South. 815, the syllabus reads:

"The fact that a wife lived two years after making a deed, void because made under threats of the prosecution of her husband, and expressed satisfaction at the acceptance of the deed and the prevention of disgrace, is not a sufficient ratification to validate the deed, the husband being still alive and subject to prosecution."

In the case of *Bell v. Anderson,* 74 Wis. 638, 43 N. W. 666, a defrauded vendee of a piano made an offer to return the instrument, which was not accepted, and then brought an action for the price paid. After the offer to return she used the piano on occasions until the time of trial. In the opinion it was said:

"The plaintiff testified that she had used the piano a little, as she had occasion, down to the time of trial. It is claimed that such use thereof is inconsistent with a rescission of the contract of purchase, and hence that her offer to return the instrument is nugatory. Such use may or may not be inconsistent with a rescission of the contract. Were we deciding the question of fact, inasmuch as the defendant, by refusing to take the piano from plaintiff's home, compelled her and her family to remain involuntary bailees of it, and inasmuch as it is not suggested that it was injured by such use, we should hold the use not inconsistent with the rescission of the contract. But the most that can be successfully claimed by the defendant is that it was for the jury, under proper instructions, to say whether the use was such an assertion of ownership by the plaintiff as would

render nugatory the offer to return the instrument."
(Page 640.)

In the case of *Tarkington et al. v. Purvis*, 128 Ind.
182, 25 N. E. 879, 9 L. R. A. 607, a fraudulent vendee
sold some of the property after a right to rescind had
been established by a tender and offer to place the
vendor in *statu quo*. In the opinion it was said:

"The doctrine is fully established that a contract in-
duced by fraud is only voidable, and if one who has
been defrauded, after discovering the deceit, acquiesces
in the sale, either by express words or by an unequiv-
ocal act, such as treating the property as his own, with
an intent to condone the fraud, he will be deemed to
have elected to affirm the contract, and he can not after-
ward rescind.  One who, uninfluenced by the fraud,
deals with the property as his own, after having fully
discovered that fraud had been practiced upon him in
the contract or transaction by or through which he ac-
quired the property, thereby waives his right to rescind.
.  .  .  Equivocal acts, however, which do not clearly
evince a purpose, with complete knowledge of the fraud,
to retain the property as his own, will not defeat the
right of the person defrauded to rescind.  The act must
be unequivocal, and must show an election to retain the
property after discovering the deceit before the right
to rescind is gone." (Page 185.)

The return of the plaintiff to his home was an inci-
dent to the shipment of the cattle and was bound up
with it as the concluding feature of an entire transac-
tion.  The contract which he was forced to accept in
order to get his cattle out of Fort Scott compelled him
to go with them or they would have been without care
and attention on the road and without supervision at
the unloading.  These were responsibilities which he
was obliged to assume in order to get the cattle moved.
After they were marketed the return home was not a
separate and independent matter of personal advantage
but was a final step of the transaction necessitated by
what had gone before.

It would be idle to contend that the plaintiff indis-
putably intended to condone the fraud and affirm the

contract because he was relieved from payment of freight in advance, secured a night ride to Kansas City in the caboose of a freight-train at the defendant's expense, and had a lower freight charge deducted from the proceeds of sale—assuming the defendant carried at a lower rate under special contract. All these things were immediate products of the vitiated agreement forced upon him by the conduct of the defendant's agent, and it can not be said as a matter of law that he willingly acceded to them. The turning in of the contract and the acceptance and use of the pass bear the same relation to the original coercion. They were integral parts of the defendant's scheme, which the plaintiff was driven to accept to save his cattle. A jury might be able to say that as soon as the plaintiff was ready to go home he commenced to deal with the defendant at arms' length, free from the constraint under which he had been acting, made up his mind to stand by the contract and determined to get what he could out of it; but the law will not arbitrarily impose such an interpretation upon his conduct.

The defendant might have had this question of fact, as well as the one first discussed above, submitted to the jury, but it made no request for instructions to that end. The instruction given stated the law, and the judgment of the district court is affirmed.