LONE STAR LIFE INS. CO. v. PIERCE et ux. (No. 1258.)

(Court of Civil Appeals of Texas. Amarillo. Jan. 23, 1918. On Motion for Rehearing, Feb. 20, 1918.)

1. CORPORATIONS ⚬⟿80(12)—STOCK SUBSCRIPTIONS—VALIDITY—PAYMENT BY NOTE.

Whether plaintiffs' subscription to corporation stock, and a loan from the corporation to them secured by mortgage on land enabling purchase of the stock, were valid and bona fide, *held* for the jury.

2. CORPORATIONS ⚬⟿80(2)—STOCK SUBSCRIPTIONS—FRAUD OF AGENT—RATIFICATION.

Where an unauthorized agent, by fraud and false representations, secured a subscription to stock, and the directors, knowing he had assumed to act, and without disclosing true facts to the subscriber, sent notice requiring payment for the stock, and accepted a note therefor, the subscriber could have his contract and note canceled for the fraud and misrepresentations of the agent.

3. CORPORATIONS ⚬⟿80(12)—ACTS OF AGENT—RATIFICATION—QUESTIONS FOR JURY.

Whether officers of corporation ratified a subscription to stock obtained by an unauthorized agent, *held* for the jury.

4. CORPORATIONS ⚬⟿80(12)—STOCK SUBSCRIPTIONS—FRAUD—ESTOPPEL.

Whether a subscriber to corporation stock was estopped by delay to set up fraud in securing his subscription, *held* for the jury.

5. LIMITATION OF ACTIONS ⚬⟿199(2)—QUESTIONS FOR JURY.

Whether a stock subscription contract alleged to have been secured by fraud was barred by the statute of limitations applying to contracts, *held* for the jury.

On Motion for Rehearing.

6. CORPORATIONS ⚬⟿106—CONTRACTS—RATIFICATION—VOID CONTRACT.

If a subscriber to corporation stock gave his note and deed of trust, which the corporation accepted, in violation of statute and Constitution, they were void, and there could be no ratification, and he could have defended a suit at any time brought to collect on such instruments.

7. LIMITATION OF ACTIONS ⚬⟿37(4)—CANCELLATION OF INSTRUMENTS.

Where a subscriber to corporation stock set up fraud inducing his subscription, his action would be barred by the statutes applicable to rescission and cancellation, and not those applicable to suits to remove clouds from titles.

Appeal from District Court, Potter County; Hugh L. Umphres, Judge.

Suit by L. A. Pierce and wife against the Lone Star Life Insurance Company. Judgment upon peremptory instruction for plaintiffs, and defendant appeals. Reversed and remanded. On motion for rehearing. Motion overruled.

Coke & Coke, of Dallas, and Madden, Trulove, Ryburn & Pipkin, of Amarillo, for appellant. Reeder & Reeder and J. B. Dooley, all of Amarillo, for appellees.

BOYCE, J. This suit was brought by L. A. Pierce and wife against the Lone Star Life Insurance Company to cancel a promissory note for the sum of $3,000, executed by the said L. A. Pierce, payable to said insurance company, and to cancel a deed of trust executed by the said Pierce and his wife on certain land, given to secure the payment of said note. The plaintiffs alleged that said note was given in payment of the balance due on a contract of subscription for stock in the insurance company; that the said subscription contract was procured by certain false and fraudulent representations as to material matters hereinafter more fully stated, made by agents of the defendant insurance company; and also that said note is illegal and void, because given in consideration of the issuance and delivery to Pierce of 20 shares, of the par value of $100, of the capital stock of said corporation, in violation of the Constitution and statutes of this state prohibiting the issuance of stock to a corporation except for money paid, property received, etc. Appellant defended on the ground, first, that the note and deed of trust evidenced an indebtedness to appellant as a result of a loan of said amount of money made by appellant company to Pierce; second, that plaintiff could not maintain his action against defendant for rescission of said contract on account of said fraudulent representations, because (a) said fraudulent representations, if made, were not made by any one authorized to represent the defendant, and were not known to it nor ratified by it when it accepted said subscription contract; (b) that after plaintiff learned of the said alleged fraudulent representations he failed to act with reasonable promptness to secure a rescission of such contract, but ratified and confirmed the ·same by his conduct and is estopped; (c) that plaintiff's right of action, if any he had, to rescind said contract and cancel said note, was barred by the two and four years' statutes of limitation, prior to the filing of this suit, on August 10, 1915.

The evidence shows that the charter of the appellant insurance company subscribed by E. H. R. Green, C. C. Slaughter, C. A. Keating, H. L. Edwards, Henry Hamilton, E. M. Reardon, M. N. Baker, E. J. Cameron, and W. B. Worsham, providing for an authorized capital of $1,000,000, approved by the Attorney General, was filed in the office of the Commissioner of Banking and Insurance on May 27, 1909. The said incorporators, thereafter having become convinced that sufficient capital could not be procured to justify the undertaking, decided to abandon the enterprise, but, on solicitation of L. H. Morgan,

---

⚬⟿For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

who expressed a desire of himself undertaking to secure the subscription of the necessary capital and organization of said company, on June 7, 1909, executed and delivered to said L. H. Morgan a written instrument, by the terms of which they assigned to the said L. H. Morgan all their interest in and to said company and its charter, and their right to receive stock in said corporation, on condition that on or about June 13, 1909, such legal proceedings be taken as would legally release said subscribers to said charter from any liability in respect thereto and on their subscriptions for stock in said company. On June 11, 1909, L. H. Morgan, together with W. C. Swain, J. M. Dawson, Frank B. Clarke, A. J. Anderson, and C. R. Hannah, met as purported stockholders of said company, and at this meeting the following proceedings were had: A resolution was adopted to the effect that the subscribers to said articles of incorporation be released from their subscription contract and all prior subscriptions for stock be rejected and canceled. All of said parties, except the said L. H. Morgan, were elected directors. It was resolved that the stock of the company should be sold at such price as to produce a surplus equal to one-half of the capital stock, and the president was authorized to make a contract with proper persons to procure subscriptions to such stock on such terms. Thereafter, on June 15, 1909, W. C. Swain, as president, and J. M. Dawson, as secretary, of the said company, made a written contract with L. H. Morgan & Co., by which said Morgan & Co. were employed sole agents to solicit and obtain subscriptions to the capital stock of said company on such terms as that the company should receive net for the stock $150 for a share of the par value of $100, and that any excess over such amount received for such stock should be used as a fund to pay organization expenses, including compensation to the said L. H. Morgan & Co., their agents and assigns, for their services and expenses, said fiscal agents being authorized to retain any payments made for stock in excess of such amount. As the result of solicitation on the part of one Knight, who Pierce understood to be some sort of a local agent of the insurance company, and J. M. Dawson, who Pierce understood to be a promoter, plaintiff, on the 6th day of November, 1909, executed and delivered to said parties the following subscription contract:

"Whereas, L. H. Morgan & Co., of Dallas, Texas, are promoting the organization of a life insurance company, which has been chartered under the laws of the state of Texas, under the name of the Lone Star Life Insurance Company, with an authorized capital stock of one million dollars and a paid-up capital of at least one hundred thousand dollars, and a net surplus of at least fifty thousand dollars, paid up and free from promotion and organization expenses; and whereas, by their acceptance of this subscription said L. H. Morgan & Co. agree to endeavor with all reasonable diligence to accomplish, on or before December 31, 1910,

200 S.W.—70

the organization of said corporation with capital stock and surplus fully paid as aforesaid, they defraying all expenses of promotion and incorporation: Now, therefore, I do hereby subscribe for 200 one-tenth shares, of the par value of ten dollars each, of the capital stock of said Lone Star Life Insurance Company; and I do hereby agree with the said company, and with the said L. H. Morgan & Co., to pay therefor the sum of $4,000, as follows: The sum of $3,000 I agree to pay, in money or in securities satisfactory to the Insurance Department of Texas, to said Lone Star Life Insurance Company at any time after January 1, 1910, immediately upon receipt of notice from said L. H. Morgan & Co., that its capital stock has been subscribed in good faith and at rates netting the company at least one hundred thousand dollars of capital, and at least fifty thousand dollars of surplus in the aggregate when paid. The remaining sum of $1,000 I agree to pay, and do pay concurrently with this subscription, to the said L. H. Morgan & Co., in consideration of their agreement hereinbefore recited, and in lieu of any further or other contribution to the expense of promoting and incorporating said company. No conditions, representations, or agreements other than those printed herein shall be binding on L. H. Morgan & Co. or the Lone Star Life Insurance Company."

As a matter of fact, said Dawson and Knight were employed by Morgan & Co. to solicit subscriptions for stock. The evidence would justify the finding that either one or both of these parties, in order to induce the subscription, represented to Pierce that the incorporators hereinbefore named, who were all well known successful business men, some of them at least being known to plaintiff as men of large wealth, had organized said company with a capital stock of $1,000,000, and had themselves subscribed for one-half of the capital stock at $200 per share, and paid the money into the company to enable them to control its affairs; that if plaintiff would take 20 shares, at $200 per share, he could pay $1,000 in cash at the time if the insurance company would take his notes with a lien on land for the other $3,000, plaintiff understanding that the representation with reference to the execution of his note was covered by the provisions of the subscription contract, providing for payment in securities, etc. The original incorporators had nothing to do with the affairs of said corporation after the execution of the assignment in June, 1909, until some time in December, 1909, or January, 1910, when they heard something of the proceedings of Morgan and his associates in their efforts to organize said corporation, and on investigation they were furnished with a copy of the minutes of the proceedings had at the attempted organization hereinbefore referred to. They learned also of the contract executed with Morgan, whereby he was employed to secure subscriptions, and that Morgan had been using their names and selling the stock at a high promotion fee. They decided to put a stop to this, and to themselves subscribe the amount necessary to organize and start the company on a paid-up capital of $100,000. At a meeting of said incorporators, and perhaps others, held in Dallas on

March 5, 1910, it not appearing, however, that plaintiff had any notice of such meeting, proceedings were taken to organize the said company. The subscription contracts procured by Morgan, including the plaintiff's were accepted, only certain of such subscription contracts having conditions attached being rejected; directors were elected, which included all of the incorporators before named; by-laws were adopted, etc. The record does not disclose how much of the stock said incorporators took under this arrangement, nor whether they paid the same promotion fees as were paid by those subscribing for stock through L. H. Morgan & Co. Shortly after this plaintiff was notified that the organization of the company had been perfected, and he was requested to pay the balance due on his subscription to the capital stock of the company, and thereafter continuous notices were mailed him, asking him to remit, and he was finally notified that unless payment was made by a stated date his stock and all payments made thereon would be forfeited. During the course of this correspondence Pierce suggested that the company make him a loan of some $7,000 or $8,000 on two sections of land in Randall county. The company expressed a willingness to lend the amount due on the subscription, provided the title was good and the value more than double such amount, which would be determined by its inspector. Considerable correspondence ensued, the effect of which was that Pierce was expressing a desire to secure a loan in excess of the amount of the subscription, and the company apparently expressing a willingness to lend him a larger amount at two different rates—the $3,000 due on the subscription at 6 per cent., and the excess at 8 per cent. Pierce finally sent to the company an abstract of title to the section of land described in the deed of trust sought to be canceled, with a request that a loan of $4,000 be made him thereon. The executive committee approved a loan on the section for $3,000, and, without referring to Pierce's proposition for a $4,000 loan, prepared and sent to Pierce for signature the note and deed of trust in question. Upon the return of this note and deed of trust the company, on August 10, 1910, acknowledged receipt thereof, concluding the letter, "Therefore we beg to hand you herewith stock certificate No. 79, for twenty full shares of the capital stock of this company, issued to you and fully paid for." The evidence on the question of ratification, estoppel, and limitations will be referred to later.

The trial court instructed the jury peremptorily to return a verdict for the plaintiff on the express ground that the testimony was "uncontroverted that the defendant, Lone Star Life Insurance Company, issued a certain stock certificate for twenty shares of the capital stock of said company and delivered same to the plaintiff L. A. Pierce, and received in exchange therefor the note and deed of trust offered in evidence before you. Wherefore said certificate of stock is void, and there was no valid consideration for said note and deed of trust." The first question for our decision is whether the peremptory instruction can be sustained on this ground.

It must be remembered in the consideration of the case that the original articles of incorporation were filed prior to the taking effect of the act of March 22, 1909 (Acts 31st Leg. c. 108), and the incorporators were proceeding under the Acts of the 24th Legislature, c. 73 (Gammell's Laws, vol. 10, pp. 827–832). This act provides for incorporation in a way different in many respects from the present law, and from the general method of incorporation of other classes of corporations. It provides that no such company shall do business with a less capital stock paid in than $100,000; that the incorporators of a proposed incorporation to be created under such act should sign and acknowledge a charter, which charter, after approval by the Attorney General, should be filed by the Insurance Commissioner. Sections 8, 9, 10, and a portion of section 12, of said act are as follows:

"Sec. 8. The Commissioner shall, upon receipt of such charter, approved by the Attorney General, record the said charter and certificate of the Attorney General, in a book kept for that purpose, and shall, upon receipt of fee for certified copy of charter, of one dollar, furnish a certified copy of such charter and certificate of Attorney General to the corporators, upon receipt of which they shall be a body politic and corporate, and may proceed to complete organization of the company. The corporators shall have the direction of the affairs and the perfecting the organization of the company until they shall call a special meeting of the stockholders, and until such meeting has been held for the purpose of adopting by-laws, electing directors, officers, and transacting general business.

"Sec. 9. Upon being notified that at least one hundred thousand dollars of the capital stock named in the charter of the company has been paid in, the Commissioner shall make an examination, and if it shall be found that such amount of the paid-in capital stock has been invested in securities authorized by this chapter, he shall so certify. The corporators, or two officers of such company, shall be required to certify under oath to the Commissioner that the money, notes, stocks, bonds, mortgages, deeds of trust or other property exhibited to him are bona fide property of the company, and are worth in cash the amounts which they represent.

"Sec. 10. When the corporators have fully complied with the requirements of this act the Commissioner shall, upon the receipt of the certificate of authority fee of one dollar, furnish the company authority to commence business and issue policies as proposed in its charter."

"Sec. 12. The paid-in capital stock of a home company shall consist in lawful money or bonds of the United States, or in bonds of this state, or any county or incorporated town or city thereof, or the stock of any national bank, or in first mortgages upon unincumbered real estate in this state, the title to which is valid, and the market value of which is double the amount loaned thereon, exclusive of buildings, unless such buildings are insured in some responsible

company, and the policy or policies transferred to the company taking such mortgage. * * * "

[1] It will be observed that the law does not require any showing that any of the capital stock of the proposed corporation has been either subscribed or paid at the time of the filing of the charter, though from such time the corporation is a "body politic and corporate." The incorporators prior to organization, and thereafter the directors elected at such organization, are given the power to act for the corporation in handling its business preliminary to the securing of a permit to transact its principal business—that of writing insurance. Evidently such persons during such time have authority to represent the corporation in securing subscriptions to its capital and making investments thereof. This latter authority would seem to follow necessarily from the provisions of section 9 quoted above. Exline-Reimers Co. v. Lone Star Life Ins. Co., 171 S. W. 1063. Were it not for the inhibition of the Constitution, it would seem that under such circumstances mortgages such as are provided by section 12 of the act might be received in payment for the capital stock; but the right to do this, we assume, would be precluded by the provisions of the Constitution on the subject as construed by our courts. It appears from the statement we have made above, however, that the stockholders regularly organized, electing directors and officers in the early part of March, 1910, and that, as stated, such officers would appear to have authority to invest the paid-in capital of the company in such securities as the law authorizes. If the directors at that time had the power to invest the capital of the company in securities of such character, we see no reason why a valid loan might not be made to the plaintiff, notwithstanding he was a subscriber for stock, and notwithstanding the fact that he would in this way be enabled to secure the money with which to pay his subscription. Of course, if the intent of the parties was to evade the law by hiding the real transaction under such form, it would not be allowed to stand. All of the negotiations with plaintiff for a "loan" were had after the organization meeting in March, 1910. Such negotiations proceeded as if a loan was being negotiated in the regular course. The fact that the stock was issued and sent to plaintiff upon receipt of the note and deed of trust is not conclusive of the character of the transaction, as it might be a bona fide loan and be still handled in this way. The evidence is, we think, of such character that this question was one of fact to be submitted to the jury, and the court was in error in giving the peremptory instruction referred to.

[2] The appellant, by various propositions and assignments, asserts that the rights of the company under the subscription contract could not be in any manner affected by the al-leged misrepresentations of the said Dawson and Knight in securing said contract, because such parties had no authority to represent the company, and no managing officer of the company had any knowledge of such alleged misrepresentations when said subscription contract was accepted. In the first place, we do not think it conclusively appears that the directors and organizers of the corporation did not have knowledge of such facts as might bind the corporation with notice of the representations that had been made by Morgan & Co., in securing the subscription. While the said original incorporators, who afterwards became directors, testified that they did not know what representations had been made to Pierce, it does appear that they knew that Morgan was using their names in his transactions, and their testimony and actions indicate that they had some reason to believe that the proceedings taken to organize said company were not altogether proper; and it occurs to us that, if they in fact had such knowledge, good faith on their part would require that a full disclosure of all the facts be made to the subscribers procured by Morgan, so that they might be given a real opportunity of deciding whether they cared to abide by their subscription under the circumstances. The appellant here claims that all Morgan's acts in securing subscriptions were without authority, and that the pretended organization of the company and subscription contract secured by him were void. The original incorporators, who were afterwards on the board of directors, knew of the facts that would render such transactions void; but the plaintiff was apparently ignorant of such facts, and his subscription contract was accepted by the board of directors, without information to the plaintiff as to such matters. But, if there were no facts that would tend to show that such parties had notice that Morgan had been making unwarranted representations in the sale of the stock, we think, subscription contracts secured by him and accepted by the corporation could, nevertheless, be set aside for material misrepresentations made in inducement thereof. This court held, in the case of Commonwealth Bonding & Casualty Co. v. Cator, 175 S. W. 1077, that a subscription contract might not be set aside after its acceptance by the corporation, when procured by fraudulent representations of a promoter which were not known to the managing officers of the corporation in accepting the subscription. The authorities on this question are conflicting, and a writ of error has been granted in that case, so that the question there decided may not be said to be settled. But, whatever may be the conclusion in that case, we do not think the decision is controlling here. In that case the representations were made at a time when the corporation had no corporate existence, and no one could legally purport

to act for it in such matter. Here the corporation acquired a legal existence upon the filing of the charter, and had the power, through its incorporators, prior to organization of the stockholders, and it directors thereafter, to appoint agents to solicit subscriptions to its stock. Morgan & Co. were ostensibly acting under authority from the corporation, and while it may be true that the attempted assignment of the incorporators of their rights to Morgan, and the attempted organization and the contract of the company made thereafter with L. H. Morgan & Co., authorizing said company to solicit subscriptions for stock, may have been void, and the corporation upon its subsequent organization might for this reason have repudiated the subscription contracts thus secured, the corporation in this instance did not repudiate the contract as it did in the Exline-Reimers Case, supra, but, on the contrary, knowing that Morgan & Co. had purported to act under authority from the corporation in securing the subscription contract, proceeded, without informing the subscribers that such party was without authority in such matter, to accept the subscription contract and notify such subscribers to pay up. In the case of American Nat. Bank v. Cruger, 91 Tex. 446, 44 S. W. 278, the question arose as to whether, in a suit by the bank on a note payable to the bank, secured by the efforts of one Hunter and Miss Lottie Cruger, to cover a shortage of one of its employès, the maker of the note could defend on the ground that the note was procured by misrepresentations which were made without the bank's knowledge, and the court stated the law applicable to this question as follows:

"Contracts made for the benefit of another, but without his privity or direction, may be rejected or affirmed, at his election. But by making the election to affirm it he adopts the agency altogether, as well that which is detrimental as that which is for his benefit. But in seeking to enforce contracts entered into by agents, the principal is subject to have them impeached by any conduct of his agent which would have had that effect if proceeding from himself. Every species of fraud, misrepresentation, or concealment, therefore, in the agent, affects the principal's right to recover. Under the principle here announced, if Hunter and Miss Lottie Cruger, without authority from the bank, undertook in its behalf to secure the shortage by procuring the note of P. B. Cruger and Miss Fannie Cruger, the acceptance of the note by the bank, with the knowledge that they had thus assumed to act for it, would be a ratification or adoption of their assumed agency, and the bank would be chargeable with the fraudulent representations made by them to Miss Fannie Cruger to the same extent as if they had been, in fact, its agents at the time of making such representations. This is upon the plain proposition that the subsequent ratification or adoption would relate back, so as to make them agents to the same extent as if they had been previously appointed."

We think the application of this language to the facts of this case leads to the conclusion that the corporation, when it accepted the subscription contracts procured by Morgan & Co., while purporting to act under authority from the corporation, took them subject to any defenses based on the conduct of the said Morgan & Co. in procuring such contracts.

[3-5] The evidence shows that in September, 1910, the plaintiff received notice of a resolution of the board of directors calling a special meeting of the stockholders for the purpose of considering the matter of reducing the authorized capital stock of the corporation [from $1,000,000 to $100,000 with a surplus of $50,000, it being stated in said notice that it was thought by the time such meeting was held the said $100,000 capital and surplus would be fully paid in, so that if the reduction of the capital was authorized the company might then secure a permit to proceed to business, and the plaintiff testified that at this time he began to be dissatisfied and suspicious. There is also testimony that some time later he heard rumors to the effect that the "big men" had not paid in anything on their stock, and had simply allowed their names to be used, etc., though he testifies that he was not fully informed of the transactions with reference to the incorporation of the company until the trial of the case. It is not necessary, we believe, to make a fuller statement of the facts on the issue of ratification, waiver, estoppel and limitations relied upon by appellant in defense of the suit, as we believe the evidence is such that all of these issues become issues of fact for the determination of the jury. Neither do we think it necessary to discuss at length the principles of law applicable to these questions; they are well settled, and full discussion thereof may be found in the following authorities: Evans v. Goggan, 5 Tex. Civ. App. 129, 23 S. W. 854; Cooper v. Lee, 75 Tex. 114, 12 S. W. 483; T. & P. Ry. Co. v. Jowers, 110 S. W. 946; G. H. & S. A. Ry. Co. v. Cade, 100 Tex. 37, 94 S. W. 219; St. Louis & San Francisco Ry. Co. v. Gorman, 79 Kan. 643, 100 Pac. 647, 28 L. R. A. (N. S.) 637; 6 Cyc. 301.

For the reasons stated, the judgment is reversed and remanded.

HUFF, C. J., not sitting, being absent in Austin with committee of judges passing on applications for writs of error.

On Motion for Rehearing.

BOYCE, J. [6-7] In order to prevent any misapprehension, which appellee seems to anticipate, as to the meaning of our opinion, we will say that the issues of ratification and limitation discussed are applicable only to that part of the cause of action which seeks to set aside and cancel the contract for fraud. If the deed of trust and note were given in violation of the provisions of the Constitution and statute, they would be,

as between the parties, void; a ratification thereof would be subject to the same vice. The plaintiff could have defended a suit brought at any time to enforce them, and a suit to have the deed of trust declared void might be truly classed as a suit to remove cloud from title. But if this issue should be determined against the plaintiff, and he relies on the alleged fraud in inducing the subscription to secure a cancellation, a different situation is presented. The contract then would not be void, but merely voidable, and would be the subject of ratification. A judgment removing cloud from the title in such case would be a mere incident to the cancellation of the deed of trust, which would be a valid instrument until set aside for the fraud. The primary purpose of the suit in such event would be rescission and cancellation, and limitation applicable to that character of suit would apply and not the law of limitation of suits to remove cloud from title. Kennon v. Miller, 143 S. W. 988; McCampbell v. Durst, 15 Tex. Civ. App. 522, 40 S. W. 320; Ry. Co. v. Titterington, 84 Tex. 218, 19 S. W. 472, 31 Am. St. Rep. 39.

With this additional statement the motion for rehearing is overruled.

HUFF, C. J., not sitting.